Thomas R. Fawkes, ILLINOIS SBN 6277451 (*pro hac vice pending*)
Brian J. Jackiw, ILLINOIS SBN 6296807 (*pro hac vice pending*)
GOLDSTEIN & MCCLINTOCK LLLP
208 S. LaSalle Street, Suite 1750
Chicago, Illinois 60604
Telephone: (312) 337-7700
Facsimile: (312) 277-2305

Christopher Celentino, SBN 131688
BALLARD SPAHR LLP
655 West Broadway, Suite 1600
San Diego, California 92101-8494
Telephone: (619) 487-0797
Facsimile: (619) 969-9269

Proposed Counsel to the Official Committee of Unsecured Creditors

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| In re: | Case No. 15-02281-LT11 |
| Sullivan International Group, Inc. | Date: May 21, 2015<br>Time: 2:00 p.m.<br>Ctrm: Dept. 3, Room 129<br>United States Bankruptcy Court<br>325 West "F" Street<br>San Diego, CA 92101-6991<br>Judge: Hon. Laura S. Taylor |
| Debtor. | |
| | **LIMITED OBJECTION OF OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO DEBTOR'S EX PARTE APPLICATION TO EMPLOY 3C ADVISORS & ASSOCIATES, INC. AS FINANCIAL ADVISOR** |

The Official Committee of Unsecured Creditors (the "*Committee*") of the above-captioned debtor (the "*Debtor*") hereby files its limited objection (the "*Objection*") to the Debtor's *ex parte* application (the "*Application*") [Docket No. 73 at page 98] to employ 3C Advisors & Associates, Inc. ("*3C*") as its financial advisor in the above-captioned chapter 11 case (the "*Chapter 11 Case*").  In support of the Objection, the Committee respectfully states as follows:

### Preliminary Statement

The Committee does not object to (a) the Debtor seeking to retain a financial advisor/investment banker to assist it in connection with the Chapter 11 Case or (b) the Debtor's selection of 3C to fill this role.  In other words, the Committee does not have a fundamental objection to the relief sought in the Application.  The Committee does, however, have serious concerns about several aspects of the proposed fee structure, and respectfully submits that the Application should be denied unless the issues raised herein are appropriately addressed.

First, as discussed in detail below, the Debtor proposes to *significantly increase* 3C's compensation post-petition despite the fact that the services being provided have for all practical purposes remained the same.  The terms upon which 3C agreed to be engaged pre-bankruptcy should be more than sufficient – 3C should not be given a substantial "raise" for providing the same services now that the Debtor has sought bankruptcy protection.

Second, the structure of the enhanced post-petition fee structure is separately problematic in several ways (some of which are carry-overs from the pre-petition version).  In particular, the proposed fee structure would (a) result in 3C being effectively doubly-compensated for sale-related work (*i.e.*, 3C would be compensated twice for the same services) and (b) encourage 3C to minimize time spent on the case by senior professionals (since 3C receives a monthly flat fee for their services regardless of time spent) and maximize the time spent by

1

junior employees (since 3C is paid for their services on an hourly basis *on top of the flat fee*).

In light of the fact that Committee counsel was only just retained, counsel has had a very limited amount of time to analyze the Application, and has not had the opportunity to engage in substantive discussions with 3C and the Debtor. Thus, the Committee hopes and expects that these issues – basic issues that the Court and the U.S. Trustee would almost certainly have raised independently – will be addressed prior to the final hearing. In the event agreement cannot be reached, however, the Committee respectfully submits that the 3C Application should be denied.

## Background

**A.     The 3C Application**

On April 6, 2015 (the "*Petition Date*"), Sullivan International Group, Inc. (the "*Debtor*") filed its voluntary petition for relief under Chapter 11. The Debtor is presently operating its business as a debtor-in-possession pursuant to the provisions of sections 1107 and 1108 of the Bankruptcy Code.

On May 4, 2015, the Debtor filed the Application, asking the Court, on shortened notice, to authorize the Debtor to employ 3C as its financial advisor pursuant to the terms of a Post-Petition Engagement Agreement (as defined below) between 3C and the Debtor.

**B.     The Committee**

On April 30, 2015, as amended on May 5, 2015, the Office of the United States Trustee appointed the Committee as an official committee to represent the interests of the Debtor's unsecured creditors pursuant to section 1102 of the Bankruptcy Code.

On May 13, 2015, the Committee retained Goldstein & McClintock LLLP and Ballard Spahr LLP as its lead and California counsel, respectively.

///

2

**Limited Objection**

The Committee makes the following specific objections to the Application:

**A.    The Post-Petition Engagement Letter Improperly Increases 3C's Compensation**

3C was originally retained by the Debtor on or about December 8 pursuant to a pre-petition engagement letter (the "*Pre-Petition Engagement Letter*"; *see* Docket No. 73 at page 117).  In the Pre-Petition Engagement Letter, 3C agreed to provide (a) a broad and open-ended array of financial consulting services (including reviewing the situation, coming up with and implementing a financial plan, putting together pro-forma financials, and generally providing all other services as might be agreed upon) and (b) certain investment banking type services with the objective of effectuating a "Transaction."  *See* Pre-Petition Engagement Letter at ¶ 6(a) and (b).  The services were to be rendered by David A. Prolman and Stephen C. Jones and other professionals as needed.  3C agreed to be compensated as follows:

- $250 / hour for financial consulting services (same for all professionals)
- 2% of any "Senior Secured Debt Financing Transaction"
- 4% of the "Transaction Value" of any other "Transaction."

On or about May 4, 2015 – almost two months after the Petition Date, the Debtor and 3C signed an amended engagement letter that it now seeks approval of pursuant to the Application (the "*Post-Petition Engagement Letter*"; *see* Docket No. 73 at page 136).  Although the Post-Petition Engagement Letter contains a more detailed list of specific financial consulting services that 3C might perform as part of its engagement (including assisting with bankruptcy reporting), the scope of services contained in both iterations of the engagement letter are quite similar and equally broad – both ultimately include all services upon which the parties might agree.  On the investment banking front, the pre-

3

and post-petition agreements are similar – 3C agrees to provide the same investment banking type services in both agreements (again with the objective of effectuating a "Transaction"). As before, the services are to be rendered by David A. Prolman and Stephen C. Jones and other professionals as needed. *However*, this time 3C is to be compensated as follows:

- $50,000 monthly flat fee for just the services of Messrs. Prolman and Jones (regardless of hours worked) ***plus*** $250 per hour for services provided by other 3C professionals
- 3% of any "Senior Secured Debt Financing Transaction"
- 5% of the "Transaction Value" of any other "Transaction."

In other words, despite the fact that the scope of the services to be provided by 3C is for all practical purposes unchanged, the Debtor now seeks to compensate 3C far more "richly" post-petition than it agreed to do pre-petition. The following chart graphically depicts the post-petition "raise" the Debtor is seeking to have this Court approve:

| Service Type | Compensation Structure Under Pre-Petition Engagement Letter | Compensation Structure Under Post-Petition Engagement Letter |
|---|---|---|
| Financial Advisory Services | $250 / hour for all professionals | $50,000 monthly flat fee for just the services of Messrs. Prolman and Jones (regardless of hours worked) ***plus*** $250 per hour for services provided by other 3C professionals |
| Senior Secured Debt Financing Transaction | 2% | 3% |
| Other Transaction | 4% | 5% |

The Committee respectfully submits that the terms 3C was willing to agree to pre-petition should not be enhanced post-petition – whether as a result of perceived "leverage" or otherwise. If 3C is unwilling to abide by the terms it

4

agreed to pre-petition, the Debtor should open the door to alternative proposals from equally competent financial advisory firms.

### B.   If Approved, the Increased Compensation Should Not Apply Retroactively

Again, the Committee believes that the increased compensation levels under the Post-Petition Engagement Letter are inappropriate. If for any reason, however, one or more of the altered fee structures is approved, such increased compensation terms should only prospectively (*i.e.*, to periods after May 4, 2015, the date the Post-Petition Engagement Letter was executed), and should not be retroactive.

This is important for several reasons. First, the Post-Petition Engagement Letter was executed almost two months into the case, yet it actually refers to the agreement being "retroactive to the date we first performed services" (which theoretically could even be read to apply retroactively to *pre-petition* periods). Second, it is particularly relevant because as the Court is aware, the Debtor entered bankruptcy seeking approval of a post-petition financing facility, on account of which 3C may seek a success fee. If 3C does seek a success fee, obviously it should only be compensated once, and only at the lower rate of compensation agreed to in the Pre-Petition Engagement Letter (the financing was obviously negotiated pre-bankruptcy). In fact, it is worth considering whether the request for expedited consideration of the Application – on the same day as the final hearing on the post-petition financing motion – might be a disguised effort to make an argument for a higher commission.

### C.   Duplicative Compensation for Sale-Related Work

Under both the Pre- and Post-Petition Engagement Letters, the compensation structure duplicatively compensates 3C for sale-related work.

Typically, the reason an investment banker receives a "success fee" or deal-based contingency is to compensate it for the time spent marketing the deal

5

– putting together pro-forma financials, drafting marketing materials, discussing the deal with prospective buyers, researching and reaching out to prospects, touring facilities with prospects, and otherwise marketing the assets and/or talking to lenders (and, in light of the recent formation of the Committee and even more recent retention of counsel, the Committee has not had an opportunity to determine how much of this "routine" work was indeed performed by 3C, and if so, how much was accomplished in the pre-petition period).

Here, however, the "financial advisory" portion of the engagement is so broad that it appears that 3C will be compensated both (a) on an hourly/flat fee basis for services that it will be performing as part of its efforts to sell the assets or refinance the debt and (b) on a success fee basis since it will be entitled to a percentage of a "Transaction."

3C cannot be allowed to have it both ways. If it wants a success fee, the Post-Petition Engagement Letter should make clear that the underlying work in furtherance of a "Transaction" must be performed on a contingent fee basis. Conversely, if 3C chooses to do the underlying work on a flat fee or hourly basis, there should be no success fee.

**D.     The Limited "Flat Fee" Distorts 3C's Staffing Incentives**

As noted above, under the Post-Petition Engagement Letter, 3C is to receive a $50,000 monthly flat fee for just the services of Messrs. Prolman and Jones (regardless of hours worked) plus $250 per hour for services provided by other 3C professionals. This structure presents an inherent financial incentive to push work down to professionals other than Messrs. Prolman and Jones.

For example, if Mr. Prolman gets pulled onto another matter for a large part of a month and has to push more work down to other 3C employees, the result is (a) substantially more cost for the estate (since it will be paying the flat fee and substantial hourly fees) and (b) substantially more income for 3C (since it is effectively getting paid twice for Mr. Prolman's services in such a scenario).

The Committee does not believe that the Application should be approved unless it is properly structured to better align the interests of the parties (for example by going back to a straight hourly structure – as was the case under the Pre-Petition Engagement Letter – or, if the Debtor believes that the estate will save money by using a flat fee, through a flat fee that covers *all* 3C professionals).

## Conclusion

For the foregoing reasons, the Committee requests that the Court deny the Application unless the issues raised herein are appropriately addressed. The Committee further reserves its rights to file a supplemental objection, or to assert additional objections at the final hearing on the Application.

Dated:  May 18, 2015   Respectfully submitted,

BALLARD SPAHR LLP


By: */s/ Christopher Celentino*
    Christopher Celentino
    Proposed Counsel to the Official
    Committee of Unsecured Creditors