CSD 1180 [03/01/15]

Name, Address, Telephone No. & I.D. No.

JESSE S. FINLAYSON, SBN 179443
jfinlayson@ftrlfirm.com
FINLAYSON TOFFER ROOSEVELT & LILLY LLP
15615 Alton Parkway, Suite 250
Irvine, CA 92618
Phone:  949.759.3810 / Fax:  949.759.3812

## UNITED STATES BANKRUPTCY COURT
### SOUTHERN DISTRICT OF CALIFORNIA
325 West "F" Street, San Diego, California 92101-6991

In Re
SULLIVAN INTERNATIONAL GROUP, INC.,

BANKRUPTCY NO. 15-02281-LT7

Tax I.D.(EIN)#:             /S.S.#:XXX-XX-          Debtor.

## NOTICE OF INTENDED ACTION AND OPPORTUNITY FOR HEARING

TO THE DEBTOR(S), ALL CREDITORS AND OTHER PARTIES IN INTEREST:

**YOU ARE HEREBY NOTIFIED** that    Christopher R. Barclay

(select one:)   ☑ the Trustee     ☐ United States Trustee     ☐ Debtor-in-Possession     ☐ Creditor,
herein, proposes to:

☐   Use, sell or lease the following property not in the ordinary course of business [include information as required by
Federal Rule of Bankruptcy Procedure 2002(c)(1)]; or

☐   Abandon the following property [description of property to be abandoned]; or

☑   Compromise or settle the following controversy [description of controversy to be settled and relevant standards for
approval as required by Local Bankruptcy Rule 9019]; or
See the Attachment and Exhibits A, B, and C for details.

☐   Seek allowance of compensation or remuneration to debtor(s) as follows [specify the nature]; or

☐   Other [specify the nature of the matter]:

CSD 1180

[Continued on Page 2]

If you object to the proposed action:

1.      **YOU ARE REQUIRED** to obtain a hearing date and time from the appropriate Courtroom Deputy for the judge assigned to your bankruptcy case. *If a Chapter 7, 11, or 12 case,* determine which deputy to call by looking at the Bankruptcy Case No. in the caption on Page 1 of this notice. If the case number is followed by the letter:

| - | MM | - | call (619) 557-7407 | - | DEPARTMENT ONE (Room 218) |
| - | LA | - | call (619) 557-6594 | - | DEPARTMENT TWO (Room 118) |
| - | LT | - | call (619) 557-6018 | - | DEPARTMENT THREE (Room 129) |
| - | PB | - | call (619) 557-5157 | - | DEPARTMENT FOUR (Room 328) |
| - | CL | - | call (619) 557-6019 | - | DEPARTMENT FIVE (Room 318) |

2.      **WITHIN TWENTY- ONE (21)[1] DAYS FROM THE DATE OF SERVICE OF THIS MOTION**, you are further required to serve a copy of your DECLARATION IN OPPOSITION TO MOTION and separate REQUEST AND NOTICE OF HEARING [Local Form CSD 1184[2]] upon the undersigned moving party, together with any opposing papers. The opposing declaration must be signed and verified in the manner prescribed by Federal Rule of Bankruptcy Procedure 9011, and the declaration must :

        a.      identify the interest of the opposing party; and

        b.      state, with particularity, the grounds for the opposition.

3.      **YOU MUST** file the original and one copy of the Declaration and Request and Notice of Hearing with proof of service with the Clerk of the U.S. Bankruptcy Court at 325 West "F" Street, San Diego, California 92101-6991, no later than the next business day following the date of service.

        IF YOU FAIL TO SERVE YOUR "DECLARATION IN OPPOSITION TO INTENDED ACTION" AND "REQUEST AND NOTICE OF HEARING" within the 21-day[1] period provided by this notice, NO HEARING WILL TAKE PLACE, you will lose your opportunity for hearing, and the moving party may proceed to take the intended action.

DATED:  May 20, 2016


                    /s/ Jesse S. Finlayson
                    [U.S. TRUSTEE]    [TRUSTEE]    [DEBTOR IN POSSESSION]
                    [Attorney for Moving Party]

---

[1]If you were served electronically or by mail, you have three (3) additional days to react to this proposed action as calculated by Fed. R. Bankr. P. 9006(f).
[2]You may obtain Local Form CSD 1184 from the office of the Clerk of the U.S. Bankruptcy Court.

*In re Sullivan International Group, Inc.*
Case No. 15-02281-LT7

## ATTACHMENT
[Notice of Intended Action and Opportunity for Hearing]

Christopher R. Barclay (the "Trustee"), the chapter 7 trustee for the bankruptcy estate of Sullivan International Group, Inc. (the "Debtor"), seeks an order approving:  (a) the Settlement Agreement (the "Bridge Bank Settlement Agreement") entered into on May 12, 2016, by and between the Trustee and Western Alliance Bank, as successor in interest to Bridge Bank, N.A. ("Bridge Bank"); and (b) the Settlement Agreement (the "Southeast PBR/Sullivan-Weston JVA Settlement Agreement" and together with the Bridge Bank Settlement Agreement, the "Settlement Agreements") entered into on May 12, 2016, by and between the Trustee, Bridge Bank, and Weston Solutions, Inc. ("Weston").  The Trustee's Declaration in Support of the Notice is attached as Exhibit A to this Notice.  Copies of the Settlement Agreements are attached to this Notice as Exhibits B and C, respectively.  The Trustee submits the following information in compliance with Local Bankruptcy Rule 9019-1:

## Nature of the Controversy

The comprehensive Settlement Agreements resolve several issues, including addressing the estate's rights and obligations with respect to two separate non-debtor entities (Sullivan Construction Jet Ventures, Inc. and Sullivan-Weston Services JVA, LLC), the pursuit and division of any recovery from potential claims by one of these entities against the government for environmental services performed both prior to and during this bankruptcy case, and the alleged lien rights of Bridge Bank and Weston with respect litigation claims asserted by the Trustee.  The Settlement Agreements materially benefit the estate and are an important step towards the resolution of this case.

Sullivan Construction Jet Ventures, Inc., formerly known as Sullivan & Charter JV, 8A Joint Venture ("SCJV"), is a wholly owned subsidiary of the Debtor.

On January 2, 2008, the United States Air Force (the "Air Force") awarded Contract No. FA8903-09-D-8582 (the "Southeast PBR Contract") to SCJV, pursuant to which SCJV was engaged to provide a full range of environmental restoration and remediation consulting services relating in connection with an environmental remediation project commonly known as the Southeast Performance Based Remediation Project (the "Southeast PBR Project").

The Trustee understands that Weston was engaged by SCJV as a Team Subcontractor on the Southeast PBR Project, and Weston performed substantial services in connection with that project.

On June 5, 2009, the Debtor and Weston formed Sullivan-Weston Services JVA, LLC (the "SW-JVA").  Currently, the Debtor and Weston own a 51% and 49% membership interest respectively in the SW-JVA.  SW-JVA entered into the three contracts that are described in detail in the Southeast PBR/Sullivan-Weston JVA Settlement Agreement (the "SW-JVA Contracts").  The Trustee is informed that the Debtor and Weston may have each guaranteed the performance by the SW-JVA of its obligations under the SW-JVA Contracts.

On June 29, 2012, the Debtor and Bridge Bank entered into a Business Financing Agreement, as amended and modified by a series of forbearance agreements and modification agreements (the "Finance Agreement"), whereby Bridge Bank agreed to provide financing to the Debtor.  Under the Finance Agreement, Bridge Bank was granted a security interest in all of the Debtor's personal property.

On April 6, 2015, the Debtor commenced a bankruptcy proceeding under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the Southern District of California (the "Bankruptcy Court").

On August 7, 2015, SCJV submitted to the Air Force:  (a) a Request for Equitable Adjustment (the "REA"), requesting that the Air Force make an equitable adjustment in the amount of $1,267,810.00 and amend the Southeast PBR Contract to compensate SCJV and Weston for changes and changed conditions experienced by them in connection with the Southeast PBR Project; and (b) an invoice (the "August 7 Invoice") in the amount of $2,799,654.60 for work performed by SCJV and Weston on the Southeast PBR Project.  The Trustee is informed that the August 7 Invoice may have been rejected, including because SCJV did not email drafts of the August 7 Invoice to the Contracting Officer Representative for review and concurrence.

On September 11, 2015, the Bankruptcy Court entered an order converting the Debtor's case from chapter 11 to chapter 7.  The Trustee is the duly authorized representative of the Debtor's bankruptcy estate pursuant to 11 U.S.C. § 704.

On December 4, 2015, the Trustee commenced an adversary proceeding in the Bankruptcy Court against certain of the Debtor's former directors and officers, U.S.B.C. Adv. Proc. No. 15-90215-LT (the "D&O Adversary Proceeding").

On December 23, 2015, the Trustee commenced adversary proceedings in the Bankruptcy Court against former shareholders Neal Clements, U.S.B.C. Adv. Proc. No. 15-90220-LT, and John Kirschbaum, U.S.B.C. Adv. Proc. No. 15-90221-LT.  On January 6, 2016, the Trustee also sent a demand letter to former shareholder William Ulmer.  The claims described in this case are collectively referred to as the "Former Shareholder Claims."

Pursuant to that certain Order Authorizing Use and Application of Cash Collateral entered on August 26, 2015 as Docket No. 433, Bridge Bank consented to the use of its cash collateral to pay the Debtor's August and September installment payments for General Liability Insurance and Director and Officers Liability Insurance in the total aggregate amount of $43,900.34.  In late January 2016, the Trustee received a check dated January 19, 2016, in the amount of $21,413.69 from AFCO Acceptance Corporation, which constituted a partial refund of amounts paid by the Debtor under Premium Finance Agreement #55-20-111235-5 (the "Insurance Premium Finance Refund").  Bridge Bank contends that the Insurance Premium Finance Refund is part of its Collateral.  The Trustee disputes this contention.

On or about February 26, 2016, the Trustee and the defendants in the D&O Adversary Proceeding entered into a Settlement Agreement (the "D&O Settlement").  On March 4, 2016, the Trustee filed a Notice of Intended Action seeking approval of the D&O Settlement.

On April 27, 2016, the Trustee entered into a Settlement Agreement with Neal Clements, John Kirschbaum, and William Ulmer that resolved the Former Shareholder Claims (the "Former Shareholder Settlement").

The D&O Settlement was approved on April 28, 2016.

On May 2, 2016, SCJV submitted to the Air Force for payment, a revised invoice for work performed by SCJV and Weston on the Southeast PBR Project, in the sum of $3,000,807.09 (the "Amended Invoice").

On May 4, 2016, the Trustee filed a Notice of Intended Action seeking approval of the Former Shareholder Settlement. Under the proposed Former Shareholder Settlement Agreement, the estate will receive $505,000.00 in cash. The deadline for parties to oppose the proposed Former Shareholder Settlement is currently May 31, 2016.

On May 10, 2016, the Trustee received the settlement payment under the D&O Settlement in the amount of $1,901,512.06. On May 17, 2016, the Trustee dismissed the D&O Adversary Proceeding with prejudice in accordance with the D&O Settlement.

Weston asserts that it is owed significant sums of money for services rendered by Weston in connection with the Southeast PBR Project, including a portion of the amounts sought to be paid pursuant to the REA and the Amended Invoice. Weston also asserts that it is owed a significant sum of money by SCJV.

SW-JVA has one bank account at Bridge Bank (Account Number 00101574499), with a current balance of $49,461.39 (the "SW-JVA Bank Account").

Bridge Bank claims that its collateral includes any sums payable to the Debtor by SCJV or SW-JVA, including on account of the Southeast PBR Contract, the Southeast PBR Project, the REA, and the Amended Invoice. Both Bridge Bank and Weston also asserted that they might have lien rights with respect to the D&O Adversary Proceeding/Settlement and the Former Shareholder Claims/Settlement.

The Trustee contends that Bridge Bank and Weston do not hold valid liens on (a) the bankruptcy estate's "commercial tort claims" as that phrase is defined in California Commercial Code Section 9102(a)(13), including, without limitation, the claims asserted by the Trustee in the D&O Adversary Proceeding and the Former Shareholder Claims; (b) claims by the Trustee under chapter 5 of the Bankruptcy Code; and (c) any recoveries by the Trustee under the D&O Adversary Proceeding, Former Shareholder Claims and under chapter 5 of the Bankruptcy Code by judgment or settlement, including the D&O Settlement.

**The Terms of the Settlements**

The material terms of the Settlement Agreements are as follows:

- Both Settlement Agreements must be approved by the Bankruptcy Court. The effectiveness of each agreement is conditioned on the approval of the other agreement.

- Both Bridge Bank and Weston agree that for purposes of the Debtor's bankruptcy case their collateral does not include any rights in or with respect to (a) "commercial tort claims" as that phrase is defined in California Commercial Code Section 9102(a)(13), as asserted by the Trustee in the D&O Adversary Proceeding and the Former Shareholder Claims; (b) claims under chapter 5 of the Bankruptcy Code; and (c) any recoveries by the Trustee under the D&O Adversary Proceeding, Former Shareholder Claims and claims by the Trustee under chapter 5 of the Bankruptcy Code by way of judgment or settlement, including the D&O Settlement and the Former Shareholder Settlement.  Both Bridge Bank and Weston further agree that any amounts recovered by the Trustee on account of the D&O Adversary Proceeding, the Former Shareholder Claims and/or any claims under chapter 5 of the Bankruptcy Code shall be retained by the Trustee for the benefit of the Debtor's bankruptcy estate free and clear of any liens or encumbrances in favor of Bridge Bank or Weston.

- As soon as reasonably practical after the effective date of the Bridge Bank Settlement Agreement, the Trustee will pay to Bridge Bank $21,413.69 less any applicable bank charges in full and complete satisfaction of Bridge Bank's asserted lien on the Insurance Premium Finance Refund.

- The Trustee will sell, transfer, and assign to Weston the bankruptcy estate's interest in the SW-JVA, including all funds on deposit in the SW-JVA Bank Account, for the total purchase price of $26,500.00 (the "SW-JVA Purchase Price").  The SW-JVA sale shall be free and clear of all claims, liens and interests pursuant to Bankruptcy Code Section 363(b) and (f).  The Trustee's sale of the estate's interest on the SW-JVA will allow Weston to assume control of that entity and perform the remaining obligations under the SW-JCA Contracts.

- Within 10 business days following the effective date of the Southeast PBR/Sullivan-Weston JVA Settlement Agreement, Weston will pay the SW-JVA Purchase Price directly to Bridge Bank on account of its security interest in SW-JVA, with said payment to be credited against any sums owed by the Debtor and/or the bankruptcy estate to Bridge Bank.

- The parties will cooperate in good faith in seeking to obtain payment of all amounts owed by the Air Force to SCJV, Weston, the Debtor, the Trustee and/or the bankruptcy estate under the Southeast PBR Project and the Southeast PBR Contract (the "PBR Claims").  Any amount recovered on the PBR Claims will be shared, disbursed and distributed within 5 business days of the date of receipt thereof as follows:

    - 10% to the Trustee for the benefit of the bankruptcy estate;
    - 57% to Weston; and
    - 33% to Bridge Bank.

- Weston is authorized and requested to take the lead role in seeking to negotiate with the Air Force and to collect the payment of the PBR Claims.  Weston, at Weston's

cost, will promptly undertake and pursue in good faith payment of the PBR Claims, and the Trustee and Bridge Bank will promptly, reasonably and in good faith cooperate with such efforts.

- The Trustee will promptly and reasonably cooperate with such collection efforts, including by allowing Weston to review and copy the books and records of the Debtor relating to the Southeast PBR Project and the Southeast PBR Contract, and by promptly executing any requests, settlement agreements, payment instructions, or other documents reasonably requested by Weston and Bridge Bank in connection with such negotiations and any resulting settlement.

- Upon request by Weston or Bridge Bank, the Trustee will promptly file a motion with the Bankruptcy Court seeking an order approving any settlement agreement reached with the Air Force regarding the PBR Claims, including as a compromise of claims pursuant to Federal Rule of Bankruptcy 9019, and/or as a sale of estate assets pursuant to Bankruptcy Code Section 363.

- The parties will exchange releases.

**The Financial Impact upon the Estate**

The combined effect of the Settlement Agreements is that:  (a) the bankruptcy estate will receive the proceeds of both the D&O Settlement and the Former Shareholder Settlement totaling slightly more than $2.4 million free and clear of any potential lien rights by Bridge Bank or Weston; (b) the bankruptcy estate will receive 10% of any amount recovered on the PBR Claims, which could potentially total as much as $300,080.71 based on the Amended Invoice; (c) the Trustee will sell the bankruptcy estate's interest in the SW-JVA to Weston and Weston will pay the SW-JVA Purchase Price ($26,500.00) directly to Bridge Bank on account of its secured claim; (d) the Trustee will pay to Bridge Bank $21,413.69 less any applicable bank charges in full and complete satisfaction of Bridge Bank's asserted lien on the Insurance Premium Finance Refund.

**The Settlement's Compliance with the Requirements for Settlement Approval under Controlling Case Law Authority**

Compromises and settlements in bankruptcy should be approved if they are "fair and equitable."  *Martin v. Kane (In re A&C Props.)*, 784 F.2d 1377, 1381 (9th Cir. 1986).  This Court should consider the following factors in considering whether a proposed settlement is fair and equitable:

(a) the probability of success in the litigation; (b) the difficulties, if any, to be encountered in the matter of collection; (c) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; (d) the paramount interest of the creditors and a proper deference to their reasonable views in the premises.

*A&C Props.*, 784 F.2d at 1381; *Woodson v. Fireman's Fund Ins. Co. (In re Woodson)*, 839 F.2d 610, 620 (9th Cir. 1988).

Basic to this determination is consideration of the "likely rewards of litigation." *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 425 (1968). The Bankruptcy Court is not required to decide the numerous questions of law and facts raised by the litigation. Instead, the Bankruptcy Court's responsibility is only to "canvass the issues to see whether the settlement 'falls below the lower point in the range of reasonableness.'" *Cosoff v. Rodman (In re W.T. Grant Co.)*, 699 F.2d 599, 613 (2d Cir. 1983).

Here, the proposed settlement meets these requirements.

The Trustee believes that he likely would have prevailed in litigation with Bridge Bank and Weston over the validity of their alleged liens on the proceeds of the D&O Settlement, the proposed Former Shareholder Settlement, or the estate's potential chapter 5 claims. The Trustee contends that the claims asserted in the D&O Adversary Proceeding and the Former Shareholder Claims are "commercial tort" claims under Article 9 of the California Commercial Code and applicable California case law, and that neither Bridge Bank nor Weston took the necessary steps under Article 9 to obtain a valid lien on these "commercial tort" claims. Similarly, the Trustee contends that Bridge Bank and Weston cannot hold valid liens on the estate's chapter 5 claims based on section 552(a) of the Bankruptcy Code. Bridge Bank and Weston dispute the Trustee's claims.

Litigating with Bridge Bank and Weston regarding these issues would have been expensive and time-consuming and the outcome of litigation is never certain. Resolving these issues provides an enormous benefit to the estate by allowing the estate to recognize the full benefit of the D&O Settlement and the proposed Former Shareholder Settlement, without the need for additional costly and uncertain litigation.

The proposed Southeast PBR/Sullivan-Weston JVA Settlement Agreement also paves the way for the Trustee, Weston, and Bridge Bank to work cooperatively to maximize the value of the PBR Claims. The 10% amount that the estate will receive on account of the PBR Claims is fair and reasonable because these claims are held by SCJV and the estate's interest in that entity is likely subject to a valid lien by Bridge Bank. In addition, the Trustee is not being asked to incur substantial administrative expenses pursuing the claims. Instead, Weston will take the lead on this issue and the estate will only benefit from any potential recovery. As noted above, the estate could potentially receive as much as $300,080.71 on account of the PBR Claims (although the actual amount will depend on how much is recovered from the Air Force under the Amended Invoice, which may be substantially less than the amount sought).

While not insubstantial, the rights given up by the estate under the Settlement Agreements are far outweighed by the benefits the estate will receive. The Trustee is selling the estate's interest in the SW-JVA to Weston and the SW-JVA Purchase Price ($26,500.00) will be paid directly to Bridge Bank, which will reduce its secured claim. The Trustee's sale of the estate's interest in the SW-JVA may also benefit the estate by eliminating or at least limiting the potential claims against the estate based on the Debtor's guaranty of the SW-JVA Contracts. The other option was to simply abandon the estate's interest in the SW-JVA, which would not have resulted in any benefit to the estate. Similarly, the Trustee is agreeing that Weston and Bridge Bank can split 90% of the potential recovery on the PBR Claims, while the estate receives 10%. Again, this makes sense because the estate's right to any portion of the potential recovery on the PBR Claims flows through SCJV, which is subject to Bridge Bank's lien. Absent an agreement, the estate likely would have received nothing

on account of the PBR Claims because any recovery would have gone 100% to Weston and Bridge Bank.  In addition, the Trustee is agreeing to pay Bridge Bank $21,413.69 less any applicable bank charges in full and complete satisfaction of Bridge Bank's asserted lien on the Insurance Premium Finance Refund.  As explained above, this refund was specifically generated by the use of Bridge Bank's cash collateral during the chapter 11 case and forwarding the refund to Bridge Bank seems fair and appropriate.  Finally, the Trustee is agreeing to grant both Bridge Bank and Weston general releases.  While it is possible that the estate might hold potential claims against these parties, the Trustee believes that resolving the estate's issue with Bridge Bank and Weston in the manner set forth in the Settlement Agreements (including obtaining the release of liens on the D&O Settlement and the proposed Former Shareholder Settlement) is more than justified under the circumstances.

* * *

For these reasons, the Trustee submits that the compromise contained in the Settlement Agreements is fair and equitable, and requests that the Court enter an order approving the Settlement Agreements.

# EXHIBIT A

## DECLARATION OF CHRISTOPHER R. BARCLAY

I, Christopher R. Barclay, declare:

1.     I am the chapter 7 trustee (the "Trustee") for the bankruptcy estate of Sullivan International Group, Inc. (the "Debtor").  I have personal knowledge of the facts stated in this declaration and if called as a witness I could and would testify competently to these facts under oath, except to matters which are stated on information and belief, and as to these facts, I am informed and believe that they are true.

2.     I submit this declaration in support of the Notice of Intended Action and Opportunity for Hearing (the "Notice") requesting approval by the Bankruptcy Court of:  (a) the Settlement Agreement (the "Bridge Bank Settlement Agreement") dated on May 12, 2016, that I entered into with Western Alliance Bank, as successor in interest to Bridge Bank, N.A. ("Bridge Bank"); and (b) the Settlement Agreement (the "Southeast PBR/Sullivan-Weston JVA Settlement Agreement" and together with the Bridge Bank Settlement Agreement, the "Settlement Agreements") dated May 12, 2016, that I entered into with Bridge Bank and Weston Solutions, Inc. ("Weston").

3.     The factual statements contained in the Attachment to the Notice are accurate to the best of my knowledge.  The facts in the Attachment to the Notice were taken nearly verbatim from the recitals in the Settlement Agreements and, in the interest of brevity, will not be repeated here.

4.     A true and accurate copy of the Bridge Bank Settlement Agreement is attached as Exhibit B to the Notice.

5.     A true and accurate copy of the Southeast PBR/Sullivan-Weston JVA Settlement Agreement is attached as Exhibit C to the Notice.

6.     I weighed a number of factors in negotiating and ultimately agreeing to the compromise set forth in the Settlement Agreements, using the best information that was available to me.

7.     Despite the complexity of the Settlement Agreements, the basic deal terms can be boiled down to four main points.  First, the bankruptcy estate will receive the proceeds of both the D&O Settlement and the Former Shareholder Settlement totaling slightly more than $2.4 million free and clear of any potential lien rights by Bridge Bank or Weston.  Second, the bankruptcy estate will

1

receive 10% of any amount recovered on the PBR Claims, which could potentially total as much as $300,080.71 based on the Amended Invoice.  Third, I will sell the bankruptcy estate's interest in the SW-JVA to Weston and Weston will pay the SW-JVA Purchase Price ($26,500.00) directly to Bridge Bank on account of its secured claim.  Fourth, I will pay to Bridge Bank $21,413.69 less any applicable bank charges in full and complete satisfaction of Bridge Bank's asserted lien on the Insurance Premium Finance Refund.

8.    I strongly believe that the proposed compromise embodied in the Settlement Agreements is in the best interest of creditors and the estate.  The Settlement Agreements substantially benefit the Debtor's creditors in several ways.

9.    I believe that I likely would have prevailed in litigation with Bridge Bank and Weston over the validity of their alleged liens on the proceeds of the D&O Settlement, the proposed Former Shareholder Settlement, or the estate's potential chapter 5 claims.  Based on the advice of counsel, my understanding is that the claims asserted in the D&O Adversary Proceeding and the Former Shareholder Claims are "commercial tort" claims under Article 9 of the California Commercial Code and applicable California case law and that neither Bridge Bank nor Weston took the necessary steps under Article 9 to obtain a valid lien on these claims.  Similarly, my understanding is that Bridge Bank and Weston cannot hold valid liens on the estate's chapter 5 claims based on section 552(a) of the Bankruptcy Code.  Bridge Bank and Weston dispute these claims.

10.    Based on my years of experience as a bankruptcy trustee, I believe that litigating with Bridge Bank and Weston regarding these issues would have been expensive and time-consuming and the outcome of litigation is never certain.  Resolving these issues provides an enormous benefit to the estate by allowing the estate to recognize the full benefit of the D&O Settlement and the proposed Former Shareholder Settlement, without the need for additional costly and uncertain litigation.

11.    The proposed Southeast PBR/Sullivan-Weston JVA Settlement Agreement also paves the way for me to work cooperatively with Weston and Bridge Bank to maximize the value of the PBR Claims.  I believe that the 10% amount that the estate will receive on account of the PBR Claims is fair and reasonable because, according to my attorneys, these claims are likely subject to a valid lien by Bridge Bank.  In addition, I think it is important that I am not being asked to incur

2

substantial administrative expenses pursuing the claims. Instead, Weston will take the lead on this issue and the estate will only benefit from any potential recovery. As noted above, the estate could potentially receive as much as $300,080.71 on account of the PBR Claims (although the actual amount will depend on how much is recovered from the Air Force under the Amended Invoice, which may be substantially less than the amount sought).

12.     I also believe that, while not insubstantial, the rights given up by the estate under the Settlement Agreements are far outweighed by the benefits the estate will receive under the proposed compromise. Under the Southeast PBR/Sullivan-Weston JVA Settlement Agreement, I am selling the estate's interest in the SW-JVA to Weston and the SW-JVA Purchase Price ($26,500.00) will be paid directly to Bridge Bank, which will reduce its secured claim. The sale of the estate's interest in the SW-JVA may also benefit the estate by eliminating or at least limiting the potential claims against the estate based on the Debtor's guaranty of the SW-JVA Contracts. The other option was to simply abandon the estate's interest in the SW-JVA, which would not have resulted in any benefit to the estate.

13.     Similarly, the Southeast PBR/Sullivan-Weston JVA Settlement Agreement provides that Weston and Bridge Bank will split 90% of the potential recovery on the PBR Claims, while the estate receives 10%. Again, this makes sense because the estate's right to any portion of the potential recovery on the PBR Claims flows through SCJV, which is subject to Bridge Bank's lien. Absent an agreement, the estate likely would have received nothing on account of the PBR Claims because any recovery would have gone 100% to Weston and Bridge Bank.

14.     Under the Bridge Bank Settlement Agreement, I am agreeing to pay Bridge Bank $21,413.69 less any applicable bank charges in full and complete satisfaction of Bridge Bank's asserted lien on the Insurance Premium Finance Refund. As explained above, this refund was specifically generated by the use of Bridge Bank's cash collateral during the chapter 11 case and forwarding the refund to Bridge Bank seems fair and appropriate.

15.     Finally, I am agreeing to grant both Bridge Bank and Weston general releases. While it is possible that the estate might hold potential claims against these parties, I believe that resolving the estate's issue with Bridge Bank and Weston in the manner set forth in the Settlement Agreements

(including obtaining the release of liens on the D&O Settlement and the proposed Former Shareholder Settlement) is more than justified under the circumstances for the reasons explained above.

16.    Accordingly, I believe that the compromise contained in the Settlement Agreements, which were negotiated at arm's length, constitutes a significant and meaningful benefit to the Debtor's estate.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on May 1, 2016, in San Diego, California.

_____
CHRISTOPHER R. BARCLAY

4

# EXHIBIT B

## SETTLEMENT AGREEMENT

This Settlement Agreement (this "Agreement") is entered into this 12th day of May 2016, by and between Christopher R. Barclay (the "Trustee"), solely in his capacity as the chapter 7 trustee for the bankruptcy estate of Sullivan International Group, Inc. (the "Debtor"), in U.S.B.C. Case No. 15-02281-LT7 (the "Bankruptcy Case"), and Western Alliance Bank, as successor in interest to Bridge Bank, N.A. ("Bridge Bank"), with reference to the following recitals:

## RECITALS

A.      On June 29, 2012, the Debtor and Bridge Bank entered into a Business Financing Agreement, as amended and modified by a series of forbearance agreements and modification agreements (the "Finance Agreement"), whereby Bridge Bank agreed to provide financing to the Debtor.

B.      The Finance Agreement states, in part, that "[Debtor] hereby grants to [Bridge Bank] a continuing security interest in the Collateral."  The term "Collateral" is defined in the Agreement as follows:  "[A]ll of [Debtor's] rights and interest in any and all personal property, whether now existing or hereafter acquired or created and wherever located, and all products and proceeds thereof and accessions thereto, including but not limited to the following . . . : (a) all accounts (including health care insurance receivables), chattel paper (including tangible and electronic chattel paper), inventory (including all goods held for sale or lease or to be furnished under a contract for service, and including returns and repossessions), equipment (including all accessions and additions thereto), instruments (including promissory notes), investment property (including securities and securities entitlements), documents (including negotiable documents), deposit accounts, letter of credit rights, money, any commercial tort claim of [Debtor] which is now or hereafter identified by [Debtor] or [Bridge Bank], general intangibles (including payment intangibles and software), goods (including fixtures) and all of [Debtor's] books and records with respect to any of the foregoing, and the computers and equipment containing said books and records; and (b) any and all cash proceeds and/or noncash proceeds thereof, including, without limitation, insurance proceeds, and all supporting obligations and the security therefore or for any right to payment."  The Debtor's obligations under the Finance Agreement were personally guaranteed by Steve Sullivan and Bruce Quattrone (collectively, the "Guarantors").

C.      On April 6, 2015, the Debtor commenced the Bankruptcy Case under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the Southern District of California (the "Bankruptcy Court").  On September 11, 2015, the Bankruptcy Court entered an order converting the Bankruptcy Case from chapter 11 to chapter 7.

D.      The Trustee is the duly authorized and appointed representative of the Debtor's bankruptcy estate pursuant to 11 U.S.C. § 704.

E.      On December 4, 2015, the Trustee commenced an adversary proceeding in the Bankruptcy Court against certain of the Debtor's former directors and officers, U.S.B.C. Adv. Proc. No. 15-90215-LT (the "D&O Adversary Proceeding").  The Trustee understands that the claims alleged in the D&O Adversary Proceeding were covered by an insurance policy issued by Allied World Assurance Company, Policy No. 0307-1621 (the "D&O Policy").

F.      On December 14, 2015, Bridge Bank filed Claim No. 127-1 in the Bankruptcy Case (the "Bridge Bank POC").

G.      On December 23, 2015, the Trustee commenced adversary proceedings in the Bankruptcy Court against former shareholders Neal Clements, U.S.B.C. Adv. Proc. No. 15-90220-LT, and John Kirschbaum, U.S.B.C. Adv. Proc. No. 15-90221-LT.  On January 6, 2016, the Trustee also sent a demand letter to former shareholder William Ulmer.  The claims described in this case are collectively referred to in this Agreement as the "Former Shareholder Claims."

H.      Pursuant to that certain Order Authorizing Use and Application of Cash Collateral entered August 26, 2015 as Docket No. 433, Bridge Bank consented to the use of its cash collateral to pay the Debtor's August and September installment payments for General Liability Insurance and Director and Officers Liability Insurance in the total aggregate amount of $43,900.34.  In late January 2016, the Trustee received a check dated January 19, 2016, in the amount of $21,413.69 from AFCO Acceptance Corporation, which constituted a partial refund of amounts paid by the Debtor under Premium Finance Agreement #55-20-111235-5 (the "Insurance Premium Finance Refund").  Bridge Bank contends that the Insurance Premium Finance Refund is part of its Collateral.  The Trustee disputes this contention.

I.      On or about February 26, 2016, the Trustee and the defendants in the D&O Adversary Proceeding entered into a Settlement Agreement (the "D&O Settlement").  Under the proposed D&O Settlement, the estate will receive $1,901,512.06 in cash from the D&O Policy.  On March 4, 2016, the Trustee filed a Notice of Intended Action seeking approval of the D&O Settlement, which is currently scheduled for hearing on May 5, 2016.

J.      The Trustee contends that, despite the language of the Finance Agreement, Bridge Bank's Collateral does not include (i) the bankruptcy estate's "commercial tort claims" as that phrase is defined in California Commercial Code Section 9102(a)(13), including, without limitation, the claims asserted by the Trustee in the D&O Adversary Proceeding and the Former Shareholder Claims; (ii) claims by the Trustee under chapter 5 of the Bankruptcy Code; and (iii) any recoveries by the Trustee under the D&O Adversary Proceeding, Former Shareholder Claims and under chapter 5 of the Bankruptcy Code by judgment or settlement, including the D&O Settlement.

K.      The Trustee and Bridge Bank believe it is in their respective best interests to fully and finally resolve the disputes existing between them.  Therefore, for good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties hereby agree as follows:

## <u>AGREEMENT</u>

1.      <u>Incorporation of Recitals</u>.  Subject to this Agreement and the conditions stated herein, Recitals A through K, inclusive, are incorporated herein by this reference.

2.      <u>Effectiveness of this Agreement</u>.

        a.      This Agreement shall become effective when and only when the Bankruptcy Court enters (a) an order approving this Agreement pursuant to Federal Rule of Bankruptcy Procedure 9019 (the "Approval Order"); and (b) an order approving the separate Settlement Agreement between the Trustee, Bridge Bank, and Weston Solutions, Inc. (the "Effective Date").

b.    The Trustee shall serve and file either a Motion or Notice of Intended Action under Local Bankruptcy Rule 2002-2 with the Bankruptcy Court seeking approval of this Agreement as soon as reasonably practical.

c.    If this Agreement is not approved by the Bankruptcy Court within ninety (90) days after the date of this Agreement, this Agreement shall be null and void and of no force or effect.

d.    Absent the granting of a stay pending appeal with respect to the Approval Order by a court of competent jurisdiction pursuant to Federal Rule of Bankruptcy Procedure 8005, each of the parties shall perform his obligations under this Agreement notwithstanding the filing of an appeal of the Approval Order.  Unless and until the Bankruptcy Court or other court of competent jurisdiction vacates the Approval Order, or otherwise stays the effectiveness of the Approval Order, each of the parties shall perform his obligations under this Agreement notwithstanding the filing of a motion in respect of the Approval Order for a new trial, to alter or amend the Approval Order, for relief from the Approval Order, or for other "reconsideration" of the Approval Order under Federal Rules of Civil Procedure 59 or 60, Federal Rules of Bankruptcy Procedure 9023 or 9024 or other applicable law or rules of court.

3.    Bridge Bank's Acknowledgment Regarding the Estate's Commercial Tort Claims and Chapter 5 Claims.  Bridge Bank hereby agrees and acknowledges that in conneciton with and for purposes of the Bankruptcy Case only its Collateral does not include any rights in or with respect to (a) "commercial tort claims" as that phrase is defined in California Commercial Code Section 9102(a)(13), as asserted by the Trustee in the D&O Adversary Proceeding and the Former Shareholder Claims; (b) claims under chapter 5 of the Bankruptcy Code; and (c) any recoveries by the Trustee under the D&O Adversary Proceeding, Former Shareholder Claims and claims by the Trustee under chapter 5 of the Bankruptcy Code by way of judgment or settlement, including the D&O Settlement.  Any amounts recovered by the Trustee on account of the D&O Adversary Proceeding, Former Shareholder Claims and/or any claims under chapter 5 of the Bankruptcy Code shall be retained by the Trustee for the benefit of the Debtor's bankruptcy estate free and clear of any liens or encumbrances in favor of Bridge Bank.

4.    Insurance Premium Finance Refund.  As soon as reasonably practical after the Effective Date, the Trustee shall pay to Bridge Bank the sum of Twenty One Thousand Four Hundred Thirteen and 69/100 Dollars ($21,413.69) less any applicable bank charges in full and complete satisfaction of Bridge Bank's asserted lien on the Insurance Premium Finance Refund.

5.    Mutual Releases.

a.    General Release by the Trustee.  Except for the rights, duties, and obligations created or expressly preserved by (i) this Agreement and/or (ii) the separate Settlement Agreement of even date entered into between the Trustee, Bridge Bank, and Weston Solutions, Inc., related to various subsidiary and joint ventures issues, including Sullivan Construction Jet Ventures, Inc., formerly known as Sullivan & Charter JV, Contract No. FA8903-09-D-8582 awarded by the United States Air Force in connection with an environmental remediation project commonly known as the Southeast Performance Based Remediation Project, and Sullivan-Weston Services JVA, LLC, and upon the Effective Date, the Trustee, on behalf of the Debtor's bankruptcy estate, his successors and assigns, hereby generally releases and forever discharges Bridge Bank and its agents, attorneys, insurance carriers, insurance representatives,

and accountants, in each case in such capacity, from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, costs, liens, and expenses (including, but not limited to, attorney's fees), damages, injuries, actions and causes of action (including, but not limited to, all avoidance actions of any type), of whatever kind or nature, whether legal or equitable, known or unknown, suspected or unsuspected, contingent or fixed, secured or unsecured, arising out of or related to any matter whatsoever, from the beginning of time to the date of this Agreement.

      b.    <u>Limited Release by Bridge Bank</u>.  Except for the rights, duties, and obligations created or expressly preserved by, and as they may arise in connection with, (i) this Agreement, (ii) the separate Settlement Agreement of even date entered into between the Trustee, Bridge Bank, and Weston Solutions, Inc., related to various subsidiary and joint ventures issues, including Sullivan Construction Jet Ventures, Inc., formerly known as Sullivan & Charter JV, Contract No. FA8903-09-D-8582 awarded by the United States Air Force in connection with an environmental remediation project commonly known as the Southeast Performance Based Remediation Project, and Sullivan-Weston Services JVA, LLC, (iii) the Bridge Bank POC, and (iv) any and all claims not expressly released herein against the Trustee, the Debtor, the Debtor's bankruptcy estate, the Guarantors and any and all other persons or entities, and upon the Effective Date, Bridge Bank, on its own behalf and on behalf of its successors and assigns, hereby releases and forever discharges the Trustee, the Debtor's bankruptcy estate, and the Trustee's agents, attorneys, and accountants, in each case in such capacity, from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, costs, liens, and expenses (including, but not limited to, attorney's fees), damages, injuries, actions and causes of action, of whatever kind or nature, whether legal or equitable, known or unknown, suspected or unsuspected, contingent or fixed, secured or unsecured, arising out of or related to the D&O Adversary Proceeding, Former Shareholder Claims and claims under chapter 5 of the Bankruptcy Code.

      c.    <u>Acknowledgment and Waiver of California Civil Code § 1542</u>.  As to the matters released herein, the parties expressly waive any and all rights under section 1542 of the Civil Code of the State of California, which provides as follows:

    A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor.

**THE PARTIES EXPRESSLY WAIVE AND RELEASE ANY RIGHT OR BENEFIT WHICH THEY HAVE OR MAY HAVE UNDER SECTION 1542 OF THE CIVIL CODE OF THE STATE OF CALIFORNIA, AND ANY SIMILAR STATUTE, CODE, LAW AND/OR REGULATION OF THE UNITED STATES, OR ANY STATE THEREOF, TO THE FULL EXTENT THAT THEY MAY WAIVE ALL SUCH RIGHTS AND BENEFITS PERTAINING TO THE MATTERS RELEASED HEREIN.** In connection with such waiver and relinquishment, each party acknowledges that the party is aware that they may hereafter discover claims presently unknown or unsuspected, or facts in addition to or different from those which the party now knows or believes to be true. Nevertheless, it is the intention of each party, through the party's release, to release all matters that are subject to this Agreement, and all claims relative thereto, which now exist, may exist, or heretofore have existed.  In furtherance of such intention, the release herein given shall be

and remain in effect as a full and complete release of such matters notwithstanding the discovery or existence of any such additional or different claims or facts relative thereto.

6. <u>Voluntary Settlement</u>.  The parties acknowledge and agree that they are each entering into this Agreement freely and voluntarily and not acting under any misapprehension as to the effect hereof.  The parties have acted and do hereby act freely and voluntarily and not under any coercion or duress.

7. <u>No Mistake of Fact or Law</u>.  In entering into this Agreement, each party recognizes that no facts or representations are ever absolutely certain.  Accordingly, each party assumes the risk of any mistake, and if that party should subsequently discover that any understanding of the facts or of the law was incorrect, each party understands and expressly agrees that they shall not be entitled to set aside this Agreement by reason thereof, regardless of any mistake of fact or law.

8. <u>Representations and Warranties</u>.  The parties hereby represent and warrant to each other the following, each of which is a continuing representation and warranty:

    a.  Each of the parties has received, or has had the ability to obtain, independent legal advice from attorneys of their choice with respect to the advisability of making the agreements provided herein and with respect to the advisability of executing this Agreement. The parties and their respective attorneys (if applicable) have made such investigation of the facts pertaining to this Agreement as they deem necessary.

    b.  Except as otherwise expressly stated in this Agreement, the parties have not made any statement or representation to the other regarding any facts relied upon by them in entering into this Agreement, and each of them specifically does not rely upon any statement, representation, or promise of the other party or any other person in entering into this Agreement, except as expressly stated in this Agreement.  Each party has relied upon his own investigation and analysis of the facts and not on any statement or representation made by any other party in choosing to enter into this Agreement and the transactions contemplated herein.

    c.  The parties, and each of them, are the sole and lawful owners of all right, title and interest in and to every claim and other matter which they purport to release herein, and they have not assigned or transferred, or purported to assign or transfer to any entity any claims or other matters herein released.  The parties, each individually and jointly, shall and hereby do indemnify, defend and hold each party released hereby harmless from and against any claims, liabilities, actions, causes of action, demands, injuries, damages, costs, and expenses (including, but not limited to, attorneys' fees), based upon or arising in connection with any such prior assignment or transfer, or any such purported assignment or transfer, or any claims or other matters released herein.

    d.  Subject only to the occurrence of the Effective Date, the parties warrant and represent that each is authorized to enter into this agreement without the consent or approval of any entity.

9. <u>No Admission Against Interest</u>.  Nothing contained in this Agreement or negotiations and communications leading up to it shall be construed as admissions against the interest of any of the parties.  Except to enforce this Agreement, the terms of this Agreement, including, without limitation, the recitals, representations, and releases made by any party shall have no force or effect and will not

be binding upon, enforceable against, or deemed an admission or acknowledgment of any fact by any party.  This Agreement shall not be admissible as evidence in any action or proceeding except to enforce this Agreement or to carry out the actions contemplated herein.

10.    <u>Miscellaneous</u>.

a.    Except as provided herein, all covenants, releases, warranties, representations, and indemnities made by the parties to one another pursuant to this Agreement shall be and remain in full force and effect upon this Agreement becoming effective.

b.    The parties agree to execute and deliver such other instruments and perform such acts as may be appropriate or reasonably necessary, from time to time, to effectuate the agreements and understandings of the parties, whether the same occur before or after the date of this Agreement.

c.    This Agreement constitutes the entire agreement between the parties with respect to the subject matter hereof and thereof and supersedes all prior and contemporaneous agreements, whether oral or written, between the parties with respect thereto.  In addition, this Agreement may not be modified or amended, nor any of its provisions waived, except by an instrument in writing signed by the parties.

d.    This Agreement shall inure to the benefit of and shall be binding upon the successors and assigns of the parties.

e.    The headings of all sections of this Agreement are inserted solely for the convenience of reference and are not a part of and are not intended to govern, limit, or aid in the construction or interpretation of any term or provision hereof.

f.    To the extent that performance is to be governed by time, time shall be deemed to be of the essence.

g.    This Agreement is to be governed by and construed in accordance with federal bankruptcy law, to the extent applicable, and where state law is implicated, the laws of the State of California shall govern.  The Bankruptcy Court shall retain exclusive jurisdiction to enforce the provisions of this Agreement.

h.    This Agreement may be executed and delivered in any number of counterparts, each of which, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same Agreement.  The parties' signatures on this Agreement may be delivered by facsimile, electronic mail, or other similar method, and any signature delivered in such manner shall have the same force and effect as an original signature.

i.    This Agreement is the product of negotiations of the parties, and in the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any party by reason of that party having drafted or caused to be drafted this Agreement, or any portion hereof, shall not be effective in regard to the interpretation hereof.

j.      Each party hereto shall bear all of his respective costs and expenses, including attorney's fees, incurred in connection with all matters discussed herein and in the preparation, negotiation, execution, and required Bankruptcy Court approval of this Agreement.  In the event that it becomes necessary for any party to this Agreement to take any action to interpret or enforce this Agreement, or any of its terms, and any party thereafter incurs costs (including attorney's fees) as a result thereof, the prevailing party in such dispute shall be entitled, in addition to any judgment or award, to an award for all costs incurred (including reasonable attorney's fees).  The prevailing party shall further be entitled to an award of reasonable attorney's fees and related costs in connection with enforcement of any judgment, including enforcement following any appeal.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year listed in the introductory paragraph of this Agreement.

**CHRISTOPHER R. BARCLAY,**
**Solely in his Capacity as the Chapter 7 Trustee for**
**the Bankruptcy Estate of Sullivan International**
**Group, Inc. in U.S.B.C. Case No. 15-02281-LT7**

By: _____

Christopher R. Barclay,
Trustee

**WESTERN ALLIANCE BANK,**
**Successor in Interest to Bridge Bank, N.A.**

By:_____

Susan Wadi
Vice President

j.      Each party hereto shall bear all of his respective costs and expenses, including attorney's fees, incurred in connection with all matters discussed herein and in the preparation, negotiation, execution, and required Bankruptcy Court approval of this Agreement.  In the event that it becomes necessary for any party to this Agreement to take any action to interpret or enforce this Agreement, or any of its terms, and any party thereafter incurs costs (including attorney's fees) as a result thereof, the prevailing party in such dispute shall be entitled, in addition to any judgment or award, to an award for all costs incurred (including reasonable attorney's fees).  The prevailing party shall further be entitled to an award of reasonable attorney's fees and related costs in connection with enforcement of any judgment, including enforcement following any appeal.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year listed in the introductory paragraph of this Agreement.

**CHRISTOPHER R. BARCLAY,**
**Solely in his Capacity as the Chapter 7 Trustee for**
**the Bankruptcy Estate of Sullivan International**
**Group, Inc. in U.S.B.C. Case No. 15-02281-LT7**

By:_____
           Christopher R. Barclay,
           Trustee

**WESTERN ALLIANCE BANK,**
**Successor in Interest to Bridge Bank, N.A.**

By:_____
           Susan Wadi
           Vice President

# EXHIBIT C

## SETTLEMENT AGREEMENT

This Settlement Agreement (this **"Agreement"**) is made, executed, entered into and delivered effective as of May 12, 2016 (the **"Execution Date"**), by and among:

Christopher Barclay (**"Trustee"**), as the chapter 7 trustee of the bankruptcy estate (**"Estate"**) of Sullivan International Group, Inc., a California corporation (**"Debtor"**), the debtor in Bankruptcy Case No. 15-02281-LT11 (the **"Bankruptcy Case"**) filed in the United States Bankruptcy Court for the Southern District of California (the **"Bankruptcy Court"**);

Western Alliance Bank, as the successor-in-interest to Bridge Bank, N.A. (**"Bridge Bank"**); and

Weston Solutions, Inc., a Pennsylvania corporation (**"Weston"**);

(each, individually, a **"Party"**, and both, collectively, the **"Parties"**), with regard to the following facts, circumstances, understandings and beliefs (collectively, **"Recitals"**):

## R E C I T A L S :

**A.**  Section 1.1 identifies terms which, when capitalized and used in this Agreement, have specifically assigned meanings for the purposes of this Agreement.

**B.**  Sullivan Construction Jet Ventures, Inc., a California corporation formerly known as Sullivan & Charter JV, 8A Joint Venture (**"SCJV"**), is a wholly owned subsidiary of Debtor.

**C.**  On January 2, 2008, the United States Air Force (the **"Air Force"**) awarded Contract No. FA8903-09-D-8582 (the **"Southeast PBR Contract"**) to SCJV, pursuant to which SCJV was engaged to provide a full range of environmental restoration and remediation consulting services relating to the environmental remediation of certain Air Force installations and other locations, in connection with an environmental remediation project commonly known as the Southeast Performance Based Remediation Project (the **"Southeast PBR Project"**).

**D.**  Weston was engaged by SCJV as a Team Subcontractor on the Southeast PBR Project, and Weston performed substantial services in connection with that Project.

**E.**  On June 5, 2009, Debtor and Weston formed Sullivan-Weston Services JVA, LLC (the **"SW-JVA"**), and as of the date of this Agreement, Debtor and Weston own a 51% and 49% membership interest respectively in the SW-JVA.

**F.**  SW-JVA entered into the following three contracts (the **"SW-JVA Contracts"**): Environmental Services Contract No. FA8903-09-D-8599 awarded by the United States Air Force, Environmental Services Contract No. W912BV-11-D-0033 awarded by the United States Army, and Environmental Services Contract No. N62473-11-D-2218 awarded by the United States Navy.

**G.**     On June 29, 2012, Debtor and Bridge Bank entered into a Business Financing Agreement, as amended by a series of forbearance agreements and modification agreements (the **"Financing Agreement"**), pursuant to which Bridge Bank provided certain financing to Debtor, and Debtor provided Bridge Bank with a continuing security interest in all or substantially all of Debtor's assets.

**H.**     On April 6, 2015, Debtor filed a voluntary petition for relief pursuant to Chapter 11 of Title 11 of the United States Code (the **"Bankruptcy Code"**).

**I.**     On August 7, 2015, SCJV submitted to the Air Force (1) a Request for Equitable Adjustment (the **"REA"**), requesting that the Air Force make an equitable adjustment in the amount of $1,267,810.00 and amend the Southeast PBR Contract to compensate SCJV and Weston for changes and changed conditions experienced by them in connection with the Southeast PBR Project; and (2) an invoice (the **"August 7 Invoice"**) in the amount of $2,799,654.60 for work performed by SCJV and Weston on the Southeast PBR Project.  The Parties are informed that the August 7 Invoice may have been rejected, including because SCJV did not email drafts of the August 7 Invoice to the Contracting Officer Representative for review and concurrence.

**J.**     On September 11, 2015, Debtor's bankruptcy case was converted to a case under Chapter 7 of the Bankruptcy Code and the Trustee was appointed.

**K.**     On May 2, 2016, SCJV submitted to the Air Force for payment, a revised invoice for work performed by SCJV and Weston on the Southeast PBR Project, in the sum of $3,000,807.09 (the **"Amended Invoice"**).

**L.**     SCJV asserts that SCJV is owed significant sums of money for services rendered by SCJV in connection with the Southeast PBR Project, including a portion of the amounts sought to be paid pursuant to the REA and the Amended Invoice.

**M.**     Weston asserts that Weston is owed significant sums of money for services rendered by Weston in connection with the Southeast PBR Project, including a portion of the amounts sought to be paid pursuant to the REA and the Amended Invoice.

**N.**     Weston asserts that Weston is owed a significant sum of money for services rendered by Weston in connection with the SW-JVA Contracts.

**O.**     The Parties are informed that SW-JVA may: (1) be in breach of the SW-JVA Contracts by reason of the purported failure by the SW-JVA to perform the services required pursuant to the SW-JVA Contracts; (2) have potential liability to the United States Air Force, the United States Army, and United States Navy, on account of unperformed contractual obligations owed by SW-JVA to those entities pursuant to the SW-JVA Contracts; (3) have potential liability to third party contractors, subcontractors and material suppliers for services provided by such third parties in connection with the SW-JVA Contracts; and (4) be insolvent as a result of those unperformed obligations and unpaid liabilities.

**P.**     Debtor and Weston are believed to have each guaranteed the performance by the SW-JVA of its obligations under the SJ-Contracts.

**Q.**     SW-JVA has one bank account at Bridge Bank (Account Number 00101574499), with a current balance of $49,461.39 (the **"SW-JVA Bank Account"**).

**R.**     Bridge Bank asserts that: (1) Debtor owes Bridge Bank a significant sum of money for principal loan advances made, interest accrued, and enforcement costs incurred, by Bridge Bank pursuant to the Financing Agreement, and (2) Bridge Bank has a continuing first priority lien (the **"Bridge Bank Lien"**) against all or substantially all assets of the Debtor, including any sums payable to the Debtor by SCJV or SW-JVA, including on account of the Southeast PBR Contract, the Southeast PBR Project, the REA, and the Amended Invoice, and against the SW-JVA Purchase Price payable by Weston pursuant to Section 3.1.

**S.**     Trustee asserts that the Estate has an interest in any sums payable to SCJV or SW-JVA on account of the Southeast PBR Contract or the SW-JVA Contracts.

**T.**     Weston asserts that Weston has an interest in any sums payable to SCJV or SW-JVA on account of the Southeast PBR Contract or the SW-JVA Contracts.

**U.**     Weston, Bridge Bank, and Trustee on behalf of Trustee, Debtor and the Estate, each purport to have various Claims against the others, including Claims relating to the Southeast PBR Contract, Southeast PBR Project, REA, Amended Invoice, SW-JVA, SW-JVA Contracts and SW-JVA Bank Account.

**V.**     The Parties desire, pursuant to this Agreement, to: (1) provide for the sale and assignment by Trustee, Debtor and the Estate, to Weston, of Debtor's membership interest in the SW-JVA, and all rights, titles, interests and Claims of Trustee, Debtor, the Estate and Bridge Bank, in and to the SW-JVA and SW-JVA Assets, including the SW-JVA Bank Account, free and clear of all Liens and Interests, including free and clear of the Bridge Bank Lien, pursuant to Bankruptcy Code Section 363(b) and (f), with the SW-JVA Purchase Price payable pursuant to Section 3.1 to be paid directly to Bridge Bank on account of the Bridge Bank Lien; (2) provide for the coordinated pursuit and sharing by Weston, Bridge Bank, and Trustee for the benefit of the Estate, of any amounts owed on account of the Southeast PBR Project or the Southeast PBR Contract, including pursuant to the REA,  or the Amended Invoice, according to the percentages set forth in this Agreement; and (4) settle and release certain Claims among the Parties.

    **THEREFORE,** pursuant to the foregoing Recitals, and in consideration of the covenants, agreements, representations and warranties set forth in this Agreement, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound by this Agreement, hereby covenant, agree, warrant, represent and declare as follows:

## ARTICLE 1
## DEFINITIONS, CONVENTIONS AND RULES OF CONSTRUCTION

**1.1** **Definitions.** The following words and phrases, when capitalized and used in this Agreement, will have the following meaning, unless the context reasonably prohibits the application of such definition:

**"AFCO Refund"** is defined in Section 2.1.

**"Agreement"** is defined in the Preamble

**"Agreement Approval Date"** is the date upon which the Agreement Approval Order is entered on the docket of the Bankruptcy Case.

**"Agreement Approval Order"** is defined in Section 2.1.

**"Air Force"** is defined in Recital C.

**"Amended Invoice"** is defined in Recital "K".

**"Appeal"** means and will be construed broadly to include an appeal of an entered order, a motion for reconsideration of an entered order, or any other motion seeking to modify, reverse, vacate, set aside or remand for further action an entered order.

**"August 7 Invoice"** is defined in Recital "I".

**"Bankruptcy Case"** is defined in the Preamble.

**"Bankruptcy Code"** is defined in Recital "H".

**"Bankruptcy Court"** is defined in the Preamble.

**"Breach"** is defined in Section 6.1.

**"Bridge Bank"** is defined in the Preamble.

**"Bridge Bank Lien"** is defined in Recital "R".

**"Business Day"** means any day upon which a majority of federally insured banks within the State of California are open for business.

**"Claim"** means and will be construed broadly to include debts, obligations, agreements, contracts, covenants, representations, warranties, guaranties, indemnities, breaches, acts, errors, omissions, defaults, damages, injuries, losses, demands, causes of action, actions, orders, judgments, encumbrances, liens, levies, writs, charges, costs, expenses, claims and liabilities of any kind, whether at law or in equity and whether known or unknown.

**"Debtor"** is defined in the Preamble.

**"Default"** is defined in Section 6.2.

**"Estate"** is defined in the Preamble.

**"Execution Date"** is defined in the Preamble.

**"Financing Agreement"** is defined in Recital "G".

**"Interest"** means any right, title, interest, ownership, indicia of title or ownership, right of possession, or other legal, equitable or possessory interest.

**"Law"** means any statute, code, ordinance, regulation, principle of common law, order or other law that is binding upon the Parties, as amended from time to time.

**"Lien"** means any mortgage, deed of trust, security interest, encumbrance, pledge, mechanics lien, judgment lien, notice of pending action, or other lien.

**"Mutual Representations"** is defined in Section 5.1.

**"Notice"** means and will be construed broadly to include any notice, inquiry, request, instruction, demand, response, acknowledgment, approval, acceptance, consent, waiver, disapproval, objection, rejection, protest or other communication required or intended pursuant to this Agreement.

**"Party"** and **"Parties"** are defined in the Preamble.

**"PBR Claims"** is defined in Section 3.2.

**"PBR Recoveries"** is defined in Section 3.2.

**"Preamble"** means the first paragraph of this Agreement.

**"REA"** is defined in Recital "I".

**"Recitals"** is defined in the Preamble.

**"Southeast PBR Contract"** is defined in Recital "C".

**"Southeast PBR Project"** is defined in Recital "C".

**"SW-JVA"** is defined in Recital "E".

**"SW-JVA Assets"** is defined in Section 3.1.

**"SW-JVA Bank Account"** is defined in Recital "Q".

**"SW-JVA Contracts"** is defined in Recital "F".

**"SW JVA Purchase Price"** is defined in Section 3.1.

**"Trustee"** is defined in the Preamble.

**"Weston"** is defined in the Preamble.

1.2    <u>**Conventions**</u>.  This Agreement incorporates the following conventions:

**(a)**    The words **"include"**, **"includes"** and **"including"** will be deemed and construed to be immediately followed by the words "without limitation".

**(b)**    The words **"will"** and **"shall"** refer to a mandatory act or obligation, unless the context in which the word is used logically prohibits the application of this convention.

**(c)**    The word **"person"** includes human beings, trusts, estates, receiverships, corporations, limited liability companies, partnerships, joint ventures, labor unions, and governmental entities.

**(d)**    The word "**Dollars**" and the symbol "**$**" refer to United States Dollars.

**(e)**    Unless otherwise expressly stated, all references to **"days"** will mean calendar days, and all references to **"years"** will mean calendar years.

**(f)**    Words or phrases denoting the **singular** will include the plural, words or phrases denoting the **plural** will include the singular, and words or phrases denoting **gender** will include all genders, unless applying this convention would be contrary to the obvious intent of this Agreement.

**(g)**    A reference to any Party or any party to any other contract or document will include such person's **successors and permitted assigns**.

1.3    <u>**Rules of Construction**</u>.  This Agreement will be liberally construed to effectuate the consummation of the transaction, sharing of proceeds, and release of Claims, provided for in this Agreement.  Article and Section headings are for convenience only and will not be considered in resolving questions of construction or interpretation.  Each Party is deemed to have had equal bargaining strength in the negotiation of this Agreement and equal responsibility for the preparation of this document, such that neither this document, nor any uncertainty or ambiguity herein, will be arbitrarily construed or resolved against any Party pursuant to any Law or rule of construction to the effect that ambiguities in documents are to be construed against the drafter of the document.

**ARTICLE 2**
**BANKRUPTCY COURT APPROVAL**

2.1    <u>**Agreement Approval Order**</u>.  This Agreement is subject to Bankruptcy Court approval and conditional upon: (a) the entry of an order (**"Agreement Approval Order"**) in the Bankruptcy Case approving this Agreement in its entirety, including as a sale and conveyance free and clear of Claims, Liens and Interests pursuant to Bankruptcy Code Section 363(b) and (f), and as a compromise of Claims pursuant to Federal Rule of Bankruptcy Procedure 9019, and (b) the entry of an order by the Bankruptcy Court in the Bankruptcy Case approving a separate agreement between Trustee and Bridge Bank of even date herewith, related to, among other things, Bridge

Bank's Lien rights regarding certain of the Estate's "commercial tort claims" and chapter 5 claims, and a partial insurance premium refund recently received by the Trustee under AFCO Acceptance Corporation Premium Finance Agreement #55-20-111235-5 (the **"AFCO Refund"**).

**2.2** **Approval Motion or Notice of Intended Action.**  As soon as reasonably possible following the Execution Date, and in any event within ten (10) Business Days following the Execution Date, Trustee will file with the Bankruptcy Court and properly serve a motion, or a notice of intended action under Local Bankruptcy Rule 2002-2, seeking the Agreement Approval Order, with a request that Weston be declared a good faith purchaser within the meaning of Bankruptcy Code Section 363(m).  Each of the other Parties will perform all acts reasonably requested by Trustee or otherwise required of them to obtain the entry of the Agreement Approval Order, including providing any declarations, documents, proof of funds, and other information reasonably requested by Trustee or otherwise required in connection therewith, and appearing as requested by Trustee at any related hearings before the Bankruptcy Court.

## ARTICLE 3
## SW-JVA AND SHARING OF SOUTHEAST PBR RECOVERIES

**3.1** **Sale of the SW-JVA Assets.**  Trustee and the Estate will sell, transfer and assign to Weston, and Weston will purchase and accept from Trustee and the Estate, for the cash sum of **$26,500.00** (the **"SW-JVA Purchase Price"**), pursuant to the execution and delivery by Trustee to Weston of a written assignment in form and content reasonably acceptable to Trustee and Weston, free and clear of all Claims, Liens and Interests including the Bridge Bank Lien, pursuant to Bankruptcy Code § 363(b) and (f), all membership interests of Debtor, Trustee and the Estate in the SW-JVA, and all rights, titles, Interests and Claims of Debtor, Trustee and the Estate, in and to the SW-JVA and all assets of the SW-JVA, including the SW-JVA Contracts, the SW-JVA Bank Account, and all funds on deposit in the SW-JVA Bank Account (collectively, **"SW-JVA Assets"**).  Within ten (10) Business Days following the Effective Date, Weston will pay the SW-JVA Purchase Price directly to Bridge Bank, in care of Bridge Bank's counsel at the address set forth in Section 7.14, or in accordance with any written wire transfer instructions provided to Weston by said counsel prior to the Effective Date, with said payment to be credited against any sums owed by Debtor or the Estate to Bridge Bank.  For the avoidance of any possible doubt: (a) the delivery of the above-described assignment by Trustee to Weston will be effective only upon the payment of the SW-JVA Purchase Price by Weston to Bridge Bank; and (b) upon the payment of the SW-JVA Purchase Price to Bridge Bank, the SW-JVA Assets will be deemed to have been assigned, transferred and conveyed to Weston free and clear of all Claims, Liens and Interests, pursuant to Bankruptcy Code § 363(b) and (f).  Bridge Bank represents and warrants to Weston that as of the Execution Date, the amount of funds on deposit in the SW-JVA Bank Account is not less than $49,461.39, and Bridge Bank covenants and agrees that except as may be hereafter authorized or instructed, either in writing by Weston or pursuant to an order of a court of competent jurisdiction, no funds will be disbursed from the SW-JVA Bank Account other than to Weston. Trustee covenants and agrees not to withdraw, or authorize the withdrawal of any funds from the SW-JVA Bank Account by any person other than Weston, except pursuant to an order of a court of competent jurisdiction.  If the amount of funds on deposit in the

SW-JVA Bank Account is less than $49,461.39 at the time the ownership and control of said Account is tendered to Weston pursuant to this Agreement, then the SW-JVA Purchase Price will be reduced by the amount of any such shortfall, and if Weston has already paid the SW-JVA Purchase Price to Bridge Bank, then Bridge Bank will promptly refund to Weston any such resulting overpayment.

**3.2    The Southeast PBR.**  The Parties will cooperate with each other in good faith in seeking to obtain from the Air Force the payment of all amounts owed by the Air Force to any of SCJV, Weston, Debtor, Trustee or the Estate, on account of, or in connection with, the Southeast PBR Project and the Southeast PBR Contract, including pursuant to the REA, the Amended Invoice, and any other invoices or requests for equitable adjustment submitted on account of any services performed or goods provided by SCJV, Weston or Debtor in connection with the Southeast PBR Project (collectively, the **"PBR Claims"**).   The Parties will jointly request of the Air Force that any and all payments made by the Air Force to any of SCJV, Weston, Trustee, the Estate, or Debtor, on or after the Execution Date, on account of the PBR Claims (collectively, the **"PBR Recoveries"**), be delivered to Trustee, in trust, for distribution to the Parties in accordance with the terms of this Agreement.  Any and all PBR Recoveries shall be shared, disbursed and distributed, and the Parties shall cause any and all PBR Recoveries to be shared, disbursed and distributed, within five (5) Business Days of the date of receipt thereof, strictly as follows:

(a)    10% to the Trustee for the benefit of the Estate;

(b)    57% to Weston; and

(c)    33% to Bridge Bank.

**3.3    The Bridge Bank Lien.**  Except for the right of Bridge Bank to receive and retain, pursuant to Section 3.2(c), Bridge Bank's 33% share of all PBR Recoveries and the payment of the SW-JVA Purchase Price, as of the Effective Date, Bridge Bank will be deemed to have waived and released any Lien or Claim of Bridge Bank against, and any other Interest of Bridge Bank in or to: (a) Debtor's membership interest in the SW-JVA; (b) all rights, titles, interests and Claims of Trustee, Debtor and the Estate in and to the SW-JVA and SW-JVA Assets, including the SW-JVA Contracts, the SW-JVA Bank Account and all funds in the SW-JVA Bank Account, (c) Weston's 57% share of the PBR Recoveries; and (d) Trustee's 10% share of the PBR Recoveries; provided, however, that except as otherwise set forth in this Section 3.3 or otherwise agreed by Bridge Bank in writing, Bridge Bank retains all of Bridge Bank's Liens, Interests and Claims in and to and against all other assets of Debtor, none of which are deemed compromised, released or waived pursuant to this Agreement.

**3.4    The Weston Lien.**  Except for the right of Weston to receive and retain, pursuant to Section 3.2(b), Weston's 57% share of all PBR Recoveries, as of the Effective Date, Weston will be deemed to have waived and released any Lien or Claim of Weston against, and any other Interest of Weston in or to: (a) Bridge Bank's 33% share of the PBR Recoveries; (b) Trustee's 10% share of the PBR Recoveries; (c) the AFCO Recovery; and (d) the SW-JVA Purchase Price; provided, however, that except as otherwise set forth in this Section 3.4, Section 3.6 below, or otherwise agreed by

Weston in writing, Weston retains all of Weston's Liens, Interests and Claims in and to and against all other assets of Debtor, none of which are deemed compromised, released or waived pursuant to this Agreement.

**3.5     Collection Responsibilities.**  Weston is authorized and requested by the other Parties to take the lead role in seeking to negotiate with the Air Force and to collect the payment of the PBR Claims.  Weston, at Weston's cost, will promptly undertake and pursue in good faith payment of the PBR Claims, and Trustee and Bridge Bank will promptly, reasonably and in good faith cooperate with such efforts, provided, however, that: (a) Weston may cease such pursuit if Weston, in Weston's sole and absolute discretion, concludes that the further pursuit of such payment is unlikely to result in any significant recovery for the Parties, by giving Notice of such decision to the other Parties; and (b) if Weston gives such Notice, then the other Parties, at their respective costs, may continue the pursuit of such payment for the benefit of the Parties, but will have no obligation to continue such pursuit.  Bridge Bank will actively participate in all negotiations and be included in all communications regarding the PBR Claims, and will seek to make available to Weston for such purposes the services of the former personnel of Debtor responsible for submitting and processing Southeast PBR Contract invoices.  Weston and Bridge Bank must agree to any settlement with the Air Force regarding the PBR Claims.  Weston will keep Bridge Bank and the Trustee reasonably informed as to the status of Weston's negotiations with the Air Force regarding such matters, including by providing Bridge Bank with copies or summaries of Weston's communications with the Air Force.  Trustee will promptly and reasonably cooperate with such collection efforts, including by allowing Weston to review and copy the books and records of Debtor relating to the Southeast PBR Project and the Southeast PBR Contract, and by promptly executing any requests, settlement agreements, payment instructions, or other documents reasonably requested by Weston and Bridge Bank in connection with such negotiations and any resulting settlement.    However, notwithstanding anything in this Agreement to the contrary, no Party will be required pursuant to this Agreement to make any warranty or representation to the Air Force (other than with respect to the validity, enforceability and approval of this Agreement, subject to the entry of the Agreement Approval Order), or to take any other action that would cause the Party to incur any liability.  Upon request by Weston or Bridge Bank, Trustee will promptly file a motion with Bankruptcy Court seeking an order approving any settlement agreement reached with the Air Force regarding the PBR Claims, including as a compromise of claims pursuant to Federal Rule of Bankruptcy 9019, and/or as a sale of estate assets pursuant to Bankruptcy Code Section 363.

**3.6     Waiver by Weston of Any Liens Against Certain Claims**.  For purposes of the Bankruptcy Case, any Lien held by Weston against any property of Debtor or the Estate will not be deemed to extend to any rights in or to: (a) "commercial tort claims" as that phrase is defined in California Commercial Code Section 9102(a)(13)9109(c)(12), as asserted by Trustee in the following adversary proceedings: *Barclay v. Sullivan et al.*, U.S.B.C. Adv. Proc. No. 15-90215-LT; *Barclay v. Clements*, U.S.B.C. Adv. Proc. No. 15-90220-LT;  and  *Barclay v. Kirschbaum*, U.S.B.C. Adv. Proc. No. 15-90221-LT; or as asserted by Trustee against William Ulmer in Trustee's demand letter of January 6, 2016; (b) Claims in the Bankruptcy Case arising under Chapter 5 of the Bankruptcy Code; and (c) any recoveries by Trustee under the above-described Claims including by way of judgment or settlement, and Weston will be deemed to have waived any Liens

held by Weston with respect to any such recoveries.  Instead, any amounts recovered by the Trustee on account of the above-described "commercial tort claims" and Claims under chapter 5 of the Bankruptcy Code will be retained by the Trustee for the benefit of the Debtor's bankruptcy estate free and clear of any liens or encumbrances in favor of Weston.

## ARTICLE 4
## RELEASE OF CLAIMS

**4.1     Release by Trustee of Certain Claims Against Weston.**  Except for obligations of Weston set forth in this Agreement and Claims based upon a Breach or Default of this Agreement by Weston, none of which are released pursuant to this Agreement, effective as of the Agreement Approval Date, Trustee, for and on behalf of Trustee, Debtor and the Estate (for purposes of this Section, the **"Releasing Parties"**), and their respective successors and assigns, including any successor trustee appointed in the Bankruptcy Case, release Weston and its successors and assigns (for purposes of this Section, the **"Released Parties"**), from any and all Claims the Releasing Parties may now hold, or at any time may have held, against the Released Parties, or any of them, relating to, resulting from, or otherwise arising in connection with the Bankruptcy Case, the Southeast PBR Contract, the Southeast PBR Project, the SW-JVA, or the SW-JVA Contracts, and all "avoidance" claims including pursuant to any of Bankruptcy Code Sections 544, 548 or 550, or California Civil Code Section 3439 (for purposes of this Section, the **"Released Claims"**).  In furtherance of this intent, the Releasing Parties agree to never prosecute or seek to enforce the Released Claims, and acknowledge and declare that this Agreement will forever bar any prosecution or enforcement of the Released Claims.

**4.2     Release by Bridge Bank of Certain Claims Against Weston.**  Except for obligations of Weston set forth in this Agreement and Claims based upon a Breach or Default of this Agreement by Weston, none of which are released pursuant to this Agreement, effective as of the Agreement Approval Date, Bridge Bank (for purposes of this Section, the **"Releasing Party"**), on behalf of itself and its successors and assigns, release Weston and its successors and assigns (for purposes of this Section, the **"Released Parties"**), from any and all Claims the Releasing Party may now hold, or at any time may have held, against the Released Parties, or any of them, relating to, resulting from, or otherwise arising in connection with the Bankruptcy Case, the Southeast PBR Contract, the Southeast PBR Project, the SW-JVA, or the SW-JVA Contracts (for purposes of this Section, the **"Released Claims"**).  In furtherance of this intent, the Releasing Party agrees to never prosecute or seek to enforce the Released Claims, and acknowledges and declares that this Agreement will forever bar any prosecution or enforcement of the Released Claims.

**4.3     Release by Weston of Certain Claims Against Bridge Bank.**  Except for obligations of Bridge Bank set forth in this Agreement and Claims based upon a Breach or Default of this Agreement by Bridge Bank, none of which are released pursuant to this Agreement, effective as of the Agreement Approval Date, Weston (for purposes of this Section, the **"Releasing Party"**), on behalf of itself and its successors and assigns, release Bridge Bank and its successors and assigns, (for purposes of this Section, the **"Released Parties"**), from any and all Claims the Releasing Party may now hold, or at

any time may have held, against the Released Parties, or any of them, relating to, resulting from, or otherwise arising in connection with the Bankruptcy Case, the Southeast PBR Contract, the Southeast PBR Project, the SW-JVA, or the SW-JVA Contracts (for purposes of this Section, the **"Released Claims"**).  In furtherance of this intent, the Releasing Party agrees to never prosecute or seek to enforce the Released Claims, and acknowledges and declares that this Agreement will forever bar any prosecution or enforcement of the Released Claims.

**4.4** **Release by Weston of Certain Claims Against Trustee and the Estate.** Except for obligations of Trustee or the Estate set forth in this Agreement, Claims based upon a Breach or Default of this Agreement by Trustee or the Estate, or Claims of Weston against the Estate referred to or set forth in the Proof of Claim filed by Weston in the Bankruptcy Case, none of which are released pursuant to this Agreement, effective as of the Agreement Approval Date, Weston (for purposes of this Section, the **"Releasing Party"**), on behalf of itself and its successors and assigns, release Trustee and its successors and assigns (for purposes of this Section, the **"Released Parties"**), from any and all Claims the Releasing Party may now hold, or at any time may have held, against the Released Parties, or any of them, relating to, resulting from, or otherwise arising in connection with the Bankruptcy Case, the Southeast PBR Contract, the Southeast PBR Project, the SW-JVA, or the SW-JVA Contracts (for purposes of this Section, the **"Released Claims"**).  In furtherance of this intent, the Releasing Party agrees to never prosecute or seek to enforce the Released Claims, and acknowledges and declares that this Agreement will forever bar any prosecution or enforcement of the Released Claims.

**4.5** **Civil Code Section 1542 Waiver.**  After full disclosure and careful consideration of the consequences this waiver, each Party hereby waives all rights and benefits conferred or intended pursuant to California Civil Code Section 1542, which states as follows:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH, IF KNOWN BY HIM OR HER, MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.

**ARTICLE 5**
**WARRANTIES, REPRESENTATIONS AND WAIVERS**

**5.1** **Mutual Representations.**  Each Party makes the following representations and warranties (the **"Mutual Representations"**) to each of the other Parties:

**(a)** **Legal Capacity.**  Subject to the entry of the Approval Order:  (1) the Party has the requisite power, authority and legal capacity to make, execute, enter into and deliver this Agreement and to perform its obligations under this Agreement, (2) any person executing this Agreement on behalf the Party is authorized to do so; and (3) neither this Agreement nor the performance by the Party of any obligation of the Party pursuant to this Agreement will violate any article, by-law,

agreement, contract, covenant, condition, restriction, injunction or order by which the Party is bound.

**(b)** **Representation by Legal Counsel.**  The Party acted pursuant to the advice of its own independent legal counsel in connection with the negotiation and preparation of this Agreement, or was advised by the other Parties to obtain the advice of such legal counsel, had fair and reasonable opportunity to obtain the advice of such legal counsel, and willfully declined to obtain the advice of such legal counsel.

**(c)** **No Pledge or Assignment of Claims.**  The Party has not voluntarily or involuntarily pledged, encumbered or assigned any Claim, any interest in any Claim, any basis for any Claim, or any defense to any Claim, purportedly released by the Party pursuant to this Agreement.

**(d)** **No Undisclosed Inducements.**  The Party entered into this Agreement in reliance solely upon its own independent investigation and analysis of the facts and circumstances, and no representations, warranties or promises by any other Party, other than those set forth in this Agreement were made by any other Party to induce the Party to enter into this Agreement.

**5.2**  **Truth and Accuracy.**  Each Party will cause its forgoing representations and warranties to be true and accurate in all material respects at all times relevant to the approval, performance and enforcement of this Agreement.

## ARTICLE 6
## BREACH AND DEFAULT

**6.1**  **Breach.**  A Party will be in breach (**"Breach"**) if the Party fails to: (a) make any payment required of the Party pursuant to this Agreement as and when due; (b) cause any representation or warranty by the Party to be true and accurate in all material respects; or (c) perform any other act required of the Party pursuant to this Agreement on or before the date or time the performance is required pursuant to this Agreement.

**6.1**  **Default.**  A Party will be in default (**"Default"**) if a Breach by the Party continues uncured for a period of more than three (3) Business Days following the date of Notice of the Breach by any other Party, provided, however, that if the Breach is not of a type that can be cured by the payment of money and more than three (3) Business Days are reasonably required to cure the Breach, then there will be no Default by reason of the Breach if the Party in Breach: (1) commences a cure of the Breach within three (3) Business Days of the date of the Notice of the Breach; (2) promptly, diligently and in good faith prosecutes the cure to completion, and (3) completes the cure by no later than thirty (30) days of the date of the Notice of the Breach.

## ARTICLE 7
## GENERAL PROVISIONS

**7.1**  **Integration.**  This Agreement sets forth the entire agreement between the Parties regarding the Sale.  All prior and contemporaneous negotiations understandings and agreements between the Parties, oral or written, regarding the subject matter of this

Agreement, are hereby superseded.  No person may orally modify this Agreement, or make any oral representation regarding this Agreement.

**7.2    Amendment.**  No modification of, deletion from, or addition to this Agreement will be effective unless made in writing and executed by each Party.

**7.3    No Obligations to Third Parties.**  This Agreement will not confer any rights upon any person not a Party, or obligate any Party to any person not a Party, provided, however, that this provision will not limit the effect of the Approval Order on persons not a Party to this Agreement.

**7.4    Expenses of Negotiation, Documentation and Performance,** Each Party will bear all costs and expenses incurred by such Party in connection with the negotiation and documentation of this Agreement and in the performance of its obligations under this Agreement.

**7.5    Time of the Essence.**  Time is of the essence with respect to all dates and time periods set forth in this Agreement, such that each Party will perform all acts required of such Party pursuant to this Agreement by the date or within the time period required pursuant to this Agreement; provided, however, that If the date by which any obligation otherwise must be performed pursuant to this Agreement, or any Notice otherwise must be given pursuant to this Agreement, occurs on a day other than a Business Day, then the date by which the obligation must be performed or the Notice must be given will be automatically extended until the next Business Day.

**7.6    Further Assurances.**  Each Party will promptly execute and deliver all documents and take all actions, including the payment of money, reasonably required to perform its duties pursuant to this Agreement.

**7.7    Governing Law, Jurisdiction and Venue.**  This Agreement is made under and will be construed in accordance with and governed by the substantive laws of the State of California, without giving effect to the principles of conflicts of law.  The Parties consent to the jurisdiction of the Bankruptcy Court and to venue in San Diego County, California, for the purpose of resolving any controversy or disagreement which may arise among the Parties with respect to this Agreement.  It will be a material Breach of this Agreement to seek to resolve any such controversy or disagreement in any other forum.

**7.8    Enforcement.**  Each Party will have the right to enforce this Agreement, including the right to prosecute proceedings at law or in equity against any person who violates or attempts to violate this Agreement, to enjoin any such person from doing so, to cause such violation to be remedied, and to recover damages for such violation.

**7.9    Waiver.**  The failure by any Party to enforce any provision of this Agreement will not constitute a waiver of the right to enforce the same provision, or any other provision of this Agreement, thereafter.  No waiver by any Party of any provision of this Agreement will be deemed or constitute a waiver of any other provision of this Agreement, whether or not similar, nor will any such waiver constitute a continuing waiver unless otherwise expressly provided in writing.

**7.10** **Severability.** If any provision of this Agreement is held by a court of competent jurisdiction to be illegal, invalid or unenforceable for any reason, then the remaining portions of this Agreement will nonetheless remain in force and effect, unless the portion of this Agreement found to be illegal, invalid or unenforceable is so material and significant that its deletion would violate the obvious primary purpose and intent of the Parties.

**7.11** **Litigation Costs and Attorneys' Fees.** If any Party commences legal proceedings against any other Party to enforce this Agreement or to declare any rights or obligations under this Agreement, then the prevailing Party will recover from the losing Party its costs of suit, including reasonable attorneys' fees, as will be determined by the court in such proceeding.

**7.12** **Execution.** This Agreement may be executed in any number of identical counterparts, each of which is an original, and all of which together will constitute one and the same agreement. The delivery of an executed counterpart of a signature page to this Agreement by electronic means will be as effective as the physical delivery of an executed counterpart of this Agreement.

**7.13** **Inurement.** This Agreement will inure to the benefit of and be binding upon the Parties and their respective successors, assigns, grantees, administrators and trustees, including any successor trustee appointed in the Bankruptcy Case.

**7.14** **Notices.** Any Notice pursuant this Agreement must be made in writing and delivered to the address indicated below, until Notice of a change of address is given by the recipient Party, after which time the Notice will be delivered to the address set forth in the recipient Party's most recent change of address Notice. Payments pursuant to this Agreement will be deemed made only upon receipt. Notices by personal service, including by FedEx, will be deemed received upon delivery. Notices by first class mail, postage prepaid, addressed as required by this Section, will be deemed received three (3) Business Days following the deposit thereof with the United States Post Office. Rejection of a Notice, refusal to accept a Notice, or inability to deliver a Notice because of a failure to give Notice of a change of address, will constitute delivery. Notwithstanding the forgoing, except with respect to a Notice of a Breach or Default, unless and until a Party gives Notice in accordance with the forgoing requirements declaring a Beach or Default, or demanding that all future Notices be made in accordance with the forgoing provisions, Notices may be given by email correspondence to the email address indicated below, until Notice of a change of email address is given by the recipient Party, and thereafter, in accordance with the recipient Party's most recent change of email address.

**Trustee**:               Christopher Barclay as Chapter 7 Trustee
                           c/o Finlayson Toffer Roosevelt & Lilly LLP
                           Attention:     Jesse S. Finlayson
                           15615 Alton Parkway – Suite 250
                           Irvine, California 92618
                           Email:         jfinlayson@ftrlfirm.com

| | |
|---|---|
| **Bridge Bank:** | Western Alliance Bank, as successor to Bridge Bank<br>c/o Susan Wadi<br>55 Almaden Blvd.<br>San Jose, CA 95113<br>Email:  susan.wadi@bridgebank.com |
| **A copy of any Notice to Bridge Bank must also be sent to Bridge Bank's Counsel at:** | Gordon Rees Scully Mansukhani LLP<br>Attention:    Jeffrey D. Cawdrey and<br>                    Megan M. Adeyemo<br>101 West Broadway – Suite 2000<br>San Diego, California 92101<br>E-Mail:        jcawdrey@gordonrees.com and<br>                    madeyemo@gordonrees.com |
| **Weston:** | Weston Solutions, Inc.<br>Attention:    Megan Schwartz<br>1400 Weston Way<br>West Chester, Pennsylvania 19380<br>E-Mail:        megan.schwartz@westonsolutions.com |
| **A copy of any Notice to Weston must also be sent to Weston's Counsel at:** | Lobel Weiland Golden Friedman LLP<br>Attention:    Michael J. Weiland and<br>                    Christopher J. Green<br>650 Town Center Drive - Suite 950<br>Costa Mesa, California 92660<br>E-Mail:        mweiland@lwgfllp.com and<br>                    cgreen@lwgfllo.com |

**[SIGNATURE PAGE(S) ATTACHED]**

**THE UNDERSIGNED PARTIES** made, executed, entered into and delivered this Agreement on the Execution Date.

**Trustee:**

Christopher Barclay, solely in his capacity as Chapter 7 Trustee of the Bankruptcy Estate of Sullivan International Group, Inc., in USBC Case No. 15-02281-LT7

**Bridge Bank:**

Western Alliance Bank, as the successor-in-interest to Bridge Bank, N.A.

By: _____
        (signature)

_____
(typed or printed name)

Its: _____
        (title or capacity)

**Weston Solutions:**

Weston Solutions, Inc., a Pennsylvania corporation

By: _____
        (signature)

_____
(typed or printed name)

Its: _____
        (title or capacity)

**THE UNDERSIGNED PARTIES** made, executed, entered into and delivered this Agreement on the Execution Date.

**Trustee:**

_____
Christopher Barclay, solely in his capacity as Chapter 7 Trustee of the Bankruptcy Estate of Sullivan International Group, Inc., in USBC Case No. 15-02281-LT7

**Bridge Bank:**

Western Alliance Bank,
as the successor-in-interest to
Bridge Bank, N.A.

By: _____
(signature)

SUSAN WADE
(typed or printed name)

Its: VICE PRESIDENT
(title or capacity)

**Weston Solutions:**

Weston Solutions, Inc.,
a Pennsylvania corporation

By: _____
(signature)

_____
(typed or printed name)

Its: _____

(title or capacity)

**THE UNDERSIGNED PARTIES** made, executed, entered into and delivered this Agreement on the Execution Date.

**Trustee:**
                                    _____
                                    Christopher Barclay, solely in his
                                    capacity as Chapter 7 Trustee of
                                    the Bankruptcy Estate of Sullivan
                                    International Group, Inc., in USBC
                                    Case No. 15-02281-LT7

**Bridge Bank:**                    Western Alliance Bank,
                                    as the successor-in-interest to
                                    Bridge Bank, N.A.

                                    By:    _____
                                           (signature)

                                           _____
                                           (typed or printed name)

                                    Its:   _____
                                           (title or capacity)

**Weston Solutions:**               Weston Solutions, Inc.,
                                    a Pennsylvania corporation

                                    By:    Megan Schwartz
                                           (signature)

                                           Megan Schwartz
                                           (typed or printed name)

                                    Its:   Assistant Corporate Secretary

                                           (title or capacity)

Page **16** of **16**